NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| KEVIN FORD, | : | Civil Action No. 17-4864 (JMV/JBC) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ESSEX COUNTY JAIL, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**VAZQUEZ, District Judge:**

## I.    INTRODUCTION

Plaintiff Kevin Ford, proceeding *pro se*, seeks to bring an amended federal civil rights complaint.    (*See* Am. Compl., DE 10.)    At this time,[1] the Court must review Mr. Ford's amended pleading to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.    *See* 28 U.S.C. § 1915(e)(2)(B); 42 U.S.C. § 1997e(c)(1).

For the reasons set forth below, the following claims may now proceed: (1) Ford's 42 U.S.C. § 1983 deliberate indifference to medical needs and retaliation claims against Nurses April Lawrence and Tanesia Davis, both of whom rendered medical care to Ford during his pretrial confinement at Essex County Correctional Facility ("ECCF"); (2) Ford's § 1983 retaliation claim against ECCF-affiliated physicians Syed Rizvi and Paul O'Conner; and (3) Ford's newly-asserted federal and state civil rights excessive force claims against Joseph Massenberg, Jr, a police officer

---

[1]    The Court previously granted Mr. Ford leave to proceed *in forma pauperis* and ordered the Clerk of the Court to file his complaint.    (DE 2.)

in the Newark Police Department ("NPD"). All of Ford's civil rights claims against ECCF i/p/a Essex County Jail are dismissed with prejudice. Ford's conditions of confinement claim against Joseph DiVincenzo, Jr. also remains dismissed. All other claims in Ford's amended complaint are/remain dismissed without prejudice.

## II.     BACKGROUND

The claims asserted in Ford's amended complaint arise out of two distinct events involving two separate groups of defendants. First, Ford alleges that members of the NPD utilized excessive force and coercive methods when they arrested him on November 11, 2016. Second, Ford seeks redress against multiple nurses, doctors, and other non-medical professionals affiliated with ECCF based on the purportedly inadequate medical treatment he received there during his post-arrest confinement.

On October 31, 2017, the Court entered its opinion and order ruling on the adequacy of the claims advanced in Ford's original complaint. (DEs 6 and 7, respectively.) As will be discussed in greater detail *infra*, the Court, by way of that screening decision (1) found that Ford sufficiently pled § 1983 retaliation and inadequate medical care claims against several then-insufficiently identified ECCF nurses; (2) dismissed Ford's conditions of confinement claims against Essex County Executive Joseph DiVincenzo, Jr. and ECCF Warden Charles Green with prejudice; (3) dismissed all other claims in Ford's original complaint without prejudice; and (4) provided Ford the opportunity to cure the pleading deficiencies of his non-prejudicially dismissed claims through the filing of an amended complaint. (*See id.*)

On or about November 11, 2017, Ford filed the amended complaint that is the subject of the Court's present scrutiny. (*See* DE 10.) As an initial matter, it must be noted that this pleading – and most particularly the timeline of events detailed therein – is not a model of clarity.

Similarly, many of the specific incidents and occurrences which were expressly pled in Ford's original complaint – and which would, at least ostensibly, appear to provide additional factual support for the claims asserted in his amended complaint – are altogether absent from Ford's amended pleading. As such, for purposes of creating a fuller picture of less-than-clear factual allegations detailed in Ford's present complaint, the Court will, when necessary, rely on its October 31, 2017 screening opinion which, in pertinent part, summarized the specific facts alleged in Ford's original pleading.

Furthermore, since filing his amended complaint in November 2017, Ford has submitted a series of piecemeal filings which contain, *inter alia*, copies of Ford's medical records (*see* DE 13-1 at PageID: 182-84; DE 14-2; DE 20 at PageID: 265-72), additional facts and narrative details (*see* DE 14; DE 20 at PageID: 240-43), and formal legal arguments (*see* DE 20 at PageID: 244-63). The Court wishes to be clear that it does not consider any of these subsequently filed documents to have been properly incorporated into the lone document that is presently subject to screening, *i.e.*, Ford's November 11, 2017 amended complaint. The Court's review of the information set forth in Ford's post-November 2017 filings has nonetheless informed its understanding of the context and issues which it appears Ford is now attempting to advance.

The caption of Ford's November 11, 2017 amended complaint formally identifies the following defendants:[2] (1) NPD Officer Joseph Massenberg, Jr.; (2) NPD Captain Meholaris; (3) Nurse April Lawrence, of the Center for Family Guidance ("CFG");[3] (4) CFG Nurse Tanesia Davis; (5) CFG Administrative Director Dr. Lionel Anicette; (6) Dr. Syed Rizvi, a CFG infirmary

---

[2] Several of these defendants were not identified in Ford's original complaint.

[3] As noted by the Court in its prior screening opinion, CFG is an ECCF-retained contractor which provides medical care to ECCF inmates. (DE 6 at 4.)

doctor; (7) Dr. Paul O'Conner, a CFG orthopedic physician; (8) Dr. Saladin Abdu Nafi, a CFG-associated physician; (9) Essex County Executive Joseph DiVincenzo, Jr.; (10) ECCF Warden Charles Green; (11) Essex County Jail, *i.e.*, ECCF; and (12) Les Paschall, Chief Executive Officer of CFG. (DE 10 at 1.) Based on the substantive claims raised in Ford's amended pleading, it appears that he also intends to name CFG employee Meio Perkins (*id.* at ¶¶ 10, 27) as an additional defendant.

The limited specific factual allegations against the NPD-related defendants detailed in Ford's amended complaint, which the Court assumes as true for purposes of the present screening, are as follows. Ford was arrested by NPD Officer Massenberg on November 11, 2016.[4] (*Id.* at ¶ 1.) Massenberg utilized excessive force to effectuate that arrest, which has resulted in Ford suffering long-term physical injuries to his left wrist, hand, and finger. (*Id.*) Ford's injuries are the result of Massenberg's "too tight" placement of handcuffs that caused "stoppage of blood circulation and excruciating pain and suffering[.]" (*Id.* at ¶ 3.) Massenberg intentionally placed "too tight" handcuffs on Ford to obtain a coerced confession from Ford as he sat in the back seat of an NPD vehicle. (*Id.*) Massenberg also conspired to deny Ford medical attention for his handcuff-related injuries and the additional injuries Ford separately sustained on November 11, 2016 during a "vicious and brutalized attack from [non-defendant] Jenille McKnight[.]" (*Id.* at ¶ 4.) NPD Captain Meholaris – who is not alleged to have had any direct involvement in Ford's November 11th arrest and whose specific role in the foregoing actions, as pled, is otherwise entirely unclear – is liable for Massenberg's actions under a theory of supervisory liability. (*Id.*

---

[4] Based on the Court's review of publicly available media reports, it appears that NPD officers arrested Ford based on his alleged involvement in the armed robbery of Jackie's Kids, a retail store located on Broad Street in Newark, New Jersey. (*Accord* DE 20 at PageID: 240 (Ford providing limited details about the basis for his November 11, 2016 arrest).)

at ¶ 2.)

The bulk of the factual allegations in Ford's amended pleading concern the ECCF/CFG-associated defendants and the purportedly inadequate medical care Ford has received for several distinct medical issues during his pre-trial confinement at ECCF. These ailments include, *inter alia*, carpal tunnel syndrome and nerve damage in Ford's left wrist; an arthritic left hip and left leg; and an additional, seemingly related condition affecting his sciatic nerve and spine. (*See* DE 6 at 4.) Ultimately, Ford – who is now 56 years old – appears to chiefly claim that the CFG/ECCF-affiliated defendants have violated his constitutional rights because he has not received doctor-recommend surgery to treat his spinal stenosis. The specific factual allegations in Ford's amended complaint against these defendants, which, again, the Court assumes as true for present purposes, are detailed below. Where noted, these allegations are supplemented by certain additional facts that are absent from Ford's current pleading but were alleged in his original complaint and summarized in the Court's October 31st screening opinion.

Following his November 11, 2016 arrest, Ford was detained at ECCF.[5] (*See* Nov. 14, 2017 Am. Compl. ¶ 5, DE 10). On April 28, 2017, Dr. O'Conner referred Ford to East Orange General Hospital ("EOGH") because Ford could not walk. (*See* Oct. 31, 2017 Op. 4, DE 6.) On that date, a CT scan was performed on Ford which showed that he needed an "emergency MRI and medical treatment." (DE 10 at ¶ 11.) After reviewing Ford's April 28th CT scan, a doctor at EOGH – presumably Dr. Simpson (*see id.* at ¶ 28) – "request[ed] his immediate transfer to [a different off-site medical facility] for surgery to correct a condition affecting Ford's sciatic nerve, followed by 90 days of rehabilitation to treat arthritis in Ford's left hip and leg." (DE 6 at 4.) On

---

[5] Ford's March 18, 2019 "Case History" submission indicates that he has been detained at ECCF since November 14, 2017. (DE 20 at PageID: 240.)

June 6, 2017, Ford had an MRI at EOGH. (DE 10 at ¶ 11.) At least three physicians reviewed Ford's June 6th MRI. (DE 6 at 5.) "Dr. [Rizvi] told Ford his MRI did not show anything wrong, but Dr. O'Conner told him he had a spinal hemorrhage." (*Id.* at 4.) A third unidentified physician at EOGH – again, presumably Dr. Simpson – "told Ford that either a needle in [his] spine can be used to prolong the surgery or [he] can get the surgery and pumped with heavy pain relieving narcotics." (*Id.*) "On June 9, 2017, Ford was sent to [EOGH and received] heavy narcotic meds for pain management[.]" (*Id.*) Ford asserts that Dr. Nafi improperly interfered in the administration of appropriate medical care to Ford because Nafi, for unspecified reasons, ordered Ford's return from EOGH on June 9, 2017. (DE 10 at ¶ 24.) Nafi did so despite being advised by physicians at EOGH that Ford had "emergency medical needs" that required a "neurological physician and surgery[.]" (*Id.*)

Ford's amended pleading indicates that the results of his April 28th CT scan and June 6th MRI – as well as "the referral and notes of the diagnosis of physician Ashley Simpson"[6] – demonstrate that he needs otherwise unspecified "neurological surgery"[7] and that any delay in this procedure "[at Ford's] age and condition could and will cause paralysis." (*Id.* at ¶¶ 28, 29.) Ford asserts that CFG administrative director Anicette disregarded Ford's need for this surgical procedure. (*Id.* at ¶ 8.) He notes that Dr. Anicette was aware of the results of Ford's CT scan which, again, allegedly show that Ford needed an "emergency MRI and medical treatment." (*Id.*

---

[6] Ford's amended complaint, unlike his original complaint, omits any reference to Dr. Simpson's alternative course of treatment that would allow him to delay that surgical procedure through a spinal injection. (*See*, *generally*, DE 10.) His amended complaint likewise omits any reference to the alternative courses of treatment suggested by Drs. Rizvi and O'Conner. (*Compare id.* and DE 6 at 4-5, 11-13.)

[7] The Court assumes, based on the medical documents submitted by Ford, that "neurological surgery" refers to a surgical procedure for his spine. (*See*, *e.g.*, DE 20 at PageID: 269.)

at ¶ 11.)  Ford, without additional explanation, attributes the "unnecessary delay in [his required neurological surgery]" to Anicette.  (*Id.* at ¶ 11.)

Ford also appears to claim that CFG-associated individuals, including Anicette, have interfered with his ability to attend subsequent, medically-necessary appointments at an off-site neurological clinic – presumably EOGH.  In that respect, he avers that Anicette falsely assured Ford, on several occasions, that he "would personally ensure [that Ford would attend those appointments.]"  (*Id.* at ¶ 10.)  Ford relatedly appears to attribute his failure to attend these off-site appointments, at least in part, to CFG employee Meio Perkins, who, for "some reason[,] failed to provide special transportation arrangements needed to transport [Ford there.]"  (*Id.*)  Ford notes that Perkins – who does not appear to be a licensed medical professional – is responsible for "scheduling [] appointments based on medical referrals and arranging special transportation for special needs and she [caused] painful harm[] and suffering to [Ford] through dilatory tactics of delaying, postponing, concealing, or not scheduling medical referral trips based on diagnostic treatments and/or surgery for non-medical reasons between [April 28, 2017 and November 5, 2017.]"  (*Id.* at ¶ 28.)  Ford avers that Perkins was aware of his serious medical needs "described in [his April 28th June 6th diagnostic tests] and the referral and notes of the diagnosis of physician Ashley Simpson[.]"  (*Id.*)

Ford also asserts that Dr. Rizvi, another CFG physician, "did delay, stop [and/or] prevent appropriate and/or effective medical treatment and/or diagnosis between but not limited to the periods of [April 28, 2017 and November 3, 2017.]"  (*Id.* at ¶ 13.)  Ford specifically claims that Rizvi "cause[d] [him] to suffer from an [ulcer] by prescribing Motrin [between April 26, 2017 and June 9, 2017.]"  (*Id.* at ¶ 14.)  Ford likewise avers that the medication which Rizvi prescribed between April 26, 2017 and October 2017 caused "a decrease, decline [and/or] drop in [Ford's

kidney functions[.]" (*Id.* at ¶ 15.) Ford claims that Rizvi, at times, coerced Ford into taking prescribed medication against his will by threatening him with a transfer to a unit "where old people and alternative lifestyle inmates are housed." (*Id.* at ¶ 17.) Ford likewise claims that Rizvi, at other times, threatened that he would stop prescribing pain medication to Ford if he continued to file grievances. (*Id.*) Rizvi also verbally abused Ford. (*Id.* at ¶ 16.)

Ford similarly accuses Dr. O'Conner, "an orthopedic doctor working at [ECCF,]" of rendering ineffective medical care between November 11, 2016 and December 21, 2016. (*Id.* at ¶ 20.) Ford specifically claims that O'Conner's provision of an ACE bandage on two occasions was inadequate for treating the nerve damage and carpal tunnel syndrome in Ford's left wrist caused by the "too tight" handcuffs. (*Id.*) Ford notes that this carpal tunnel diagnosis was rendered by non-defendant physician Dr. Grace Melendez. (*Id.*)

Ford claims that Dr. Rizvi and Dr. O'Conner prescribed a course of medical treatment that they knew would not effectively treat his left wrist. (*Id.* at ¶ 21.) For example, they prescribed Tylenol for pain management, even though they understood that this medicine was inadequate to treat Ford's pain. (*Id.* at ¶ 22.) He also claims that these defendants "threatened retaliatory actions against [Ford] for filing grievances" and that they in fact acted on those threats by prescribing medication to Ford that "would barely [alleviate his] pain and spasm[s]" and by "deny[ing Ford] hot water bottles, ice packs, *etc.*" (*Id.* at ¶ 23.)

Ford avers that Rizvi, Anicette, O'Conner, Nafi, Perkins, and other unidentified CFG employees and contractors were all involved "in the conspiracy, play, scheme, or delay of treatment for serious medical needs for non-medical reasons[.]" (*Id.* at ¶ 25; *see also id.* at ¶ 30.) In that respect, he specifically alleges that Rizvi purportedly withheld pertinent medical information from Ford as part of a "plot and/or plan to deceive, deny and limit [Ford's] knowledge

of his medical condition" in order to deny Ford "appropriate and effective medical care[.]"  (*Id.* at ¶¶ 18, 19.)

Ford also asserts supervisory liability claims against CFG Chief Executive Officer Les Paschall, Essex County Executive Joseph DiVincenzo, Jr., and ECCF Warden Charles Green for the purportedly constitutionally deficient medical care he received at ECCF.  (*Id.* at ¶¶ 26, 31, 35.)  Ford relatedly claims that Paschall and Green are liable, under a theory of supervisory liability, for the conspiratorial actions of the CFG employees which denied him necessary medical care.  (*Id.* at ¶¶ 26, 31.)  However, Ford's amended complaint does not allege any facts which suggest that Paschall had any personal, direct interactions with CFG personnel or Ford.  With respect to DiVincenzo, Ford specifically claims only that DiVincenzo had a duty "to 'inspect' to make sure that [CFG is providing] appropriate and effective health care for the inmates of [ECCF]."  (*Id.* at ¶ 35.)  As for Warden Green, Ford expressly notes that the warden witnessed the deficient medical care rendered by CFG during his personal inspections of CFG's operations between August 2017 and October 2017.  (*Id.* at ¶ 31.)  Ford claims to have spoken to Green, directly, "about the [improper] conduct of [CFG] employees [in their provision of medical care to him]" and that Green did nothing to ensure that Ford received "effective medical services conducive to [Ford's] serious medical needs[.]"  (*Id.* at ¶ 32.)  Ford also tangentially claims that Green is liable, in his supervisory capacity, for the sciatic nerve pain which Ford has experienced "solely from jumping up and down [from the] top bunk" in which Ford slept.  (*Id.* at ¶ 33.)  Ford avers that Green is aware of this "dangerous hazardous condition" and has not taken any action to abate ECCF's problematic "inmate population bedding arrangement."  (*Id.* at ¶¶ 33, 34.)

With respect to Ford's claims against CFG Nurses Davis and Lawrence, his amended complaint alleges that those two defendants caused him pain and suffering when they, on or about

June 3, 2017, "refused, delayed [and/or] stopped [administrating Ford] prescribed medicines based on medical diagnosis without [authorization from a doctor]." (*Id.* at ¶ 5; *see also id.* at ¶ 6.) Ford further claims that both nurses verbally abused him and retaliated against him by ordering "institutional bed changes" after he filed grievances against them. (*Id.* at ¶¶ 7, 9.) Ford asserts that Dr. Anicette is also liable for the nurses' improper actions "in a 'supervisor liability' capacity" because Anicette failed to properly address Ford's grievances and complaints about those two defendants. (*Id.* at ¶¶ 8, 9, 12.) Ford notes that he and Anicette "had several direct[, in-person] discussions . . . between [June 9, 2017 and November 3, 2017]" regarding Davis and Lawrence's improper actions and that Anicette, in the course of those conversations, falsely assured Ford that he would speak with the CFG medical staff and otherwise address their inappropriate actions. (*Id.* at ¶ 9.)

Ford's amended complaint seeks relief under 42 U.S.C. § 1983. (*Id.* at PageID: 164-66.) Ford also asserts a New Jersey Civil Rights Act ("NJCRA") claim based on the purported violation of his rights under Article I, section 7 of the New Jersey Constitution. (*Id.* at PageID: 164.) That constitutional provision provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated[.]" N.J. Const. art. I, ¶ 7.

## III.   RELEVANT LEGAL STANDARDS

### a.   The PLRA and Screening

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (Apr. 26, 1996) ("PLRA"), district courts must review complaints in those civil actions in which a prisoner is proceeding *in forma pauperis, see* 28 U.S.C. § 1915(e)(2)(B), seeks redress against a governmental employee or entity, *see* 28 U.S.C. § 1915A(b), or brings a claim

with respect to prison conditions, *see* 42 U.S.C. § 1997e. The PLRA directs district courts to *sua sponte* dismiss any claim that is frivolous, is malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B).

"The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Schreane v. Seana*, 506 F. App'x 120, 122 (3d Cir. 2012) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)); *Mitchell v. Beard*, 492 F. App'x 230, 232 (3d Cir. 2012) (discussing 42 U.S.C. § 1997e(c)(l)); *Courteau v. United States*, 287 F. App'x. 159, 162 (3d Cir. 2008) (discussing 28 U.S.C. § 1915A(b)). That standard is set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as explicated by the United States Court of Appeals for the Third Circuit.

To survive the Court's screening for failure to state a claim, the complaint must allege 'sufficient factual matter' to show that the claim is facially plausible. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). "[F]acial plausibility [means that] the plaintiff [has pled] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). "[A] pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint may also be dismissed for failure to state a claim if it appears "'that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner*, 404 U.S. 519, 521 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981).

*Pro se* pleadings are liberally construed. *See Haines v. Kerner*, 404 U.S. 519 (1972). Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).).

Importantly, while this Court's review under the foregoing standard is, as a general matter, limited to the facts contained in the relevant pleading, the Court "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); *accord In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *see also Johnson v. Roskosci*, No. 3:15-CV-1232, 2016 WL 4594147, at *8 (M.D. Pa. Sept. 2, 2016) (considering both "the allegations in [the *pro se* plaintiff's] complaint and [his] subsequent filings" for purposes of conducting the requisite PLRA screening of that pleading).

### b. 42 U.S.C. § 1983 and the NJCRA

42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To obtain relief under Section 1983, a plaintiff must establish (1) that one of his rights secured by the Constitution or laws of the United States was violated; and (2) that this violation was caused or committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that Section 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights).

Critically, "vicarious or supervisor liability in inapplicable to . . . § 1983 suits." *Iqbal*, 556 U.S. at 676. Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*; *accord Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 680 (E.D. Pa. 2018) ("[T]o prevail in a civil rights action, a plaintiff must demonstrate that the defendant was personally involved in the alleged wrongful conduct"); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990) ("Only those defendants whose inactions or actions personally caused [Plaintiff's] injury may be held liable under § 1983."). Personal involvement can be shown through allegations, made with "appropriate particularity," of personal direction or of actual knowledge and acquiescence. *Kornegey*, 299 F. Supp. 3d at 680 and at 680 n.17 (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

The foregoing legal considerations apply with equal force to claims asserted under the New Jersey Civil Rights Act. *Hartman v. Gloucester Township*, No. 12-2085, 2014 WL 2773581, at *6 (D.N.J. June 19, 2014); *accord Pettit v. New Jersey*, No. 09-3735, 2011 WL 1325614, at *3 (D.N.J. Mar. 30, 2011) ("This district has repeatedly interpreted NJCRA analogously to § 1983."); *Armstrong v. Sherman*, No. 09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010) ("the language of the [NJCRA], like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated."). Indeed, "when pled together, [the NJCRA and § 1983] are analyzed under the same standard[.]" *Pettit*, 2011 WL 1325614, at *4; *see also Hottenstein v. Sea Isle City*, 793 F. Supp. 2d 688, 695 (D.N.J. 2011). Thus, the Court's Section 1983 excessive force analysis applies equally to Ford's parallel NJCRA excessive force claim.

# IV.   ANALYSIS

### a.  Ford's § 1983 retaliation and inadequate medical care claims against Nurses Lawrence and Davis may now proceed; Ford's related supervisory liability claim against Dr. Lionel Anicette is dismissed

As already noted, the Court, by way of its October 31, 2017 screening decision, found, *inter alia*, that Ford's original complaint sufficiently pled § 1983 retaliation and inadequate medical care claims against three then-insufficiently identified ECCF nurses, Nurse April, Nurse Davis, and Nurse Mary (the "Nurse Defendants").   (DE 6 at 13, 15-16.)   At that time, however, the Court also observed that Ford "[would be] unlikely to obtain service of the summons and complaint without providing the full names of the defendants[.]"   (*Id.* at 13.)   The Clerk was accordingly ordered to withhold issuing summons for those defendants until such time as Ford "submit[ted] an amended complaint substituting the full names of the Nurse Defendants for purposes of services of process[.]"   (DE 7.)   Ford was afforded thirty days to provide that information or, in the alternative, "submit a written statement to the Court explaining what he did to discover the names of the Nurse Defendants and why he was unable to obtain the [additional identification] information[.]"   (*Id.*)

Ford, by way of his November 14, 2017 amended complaint, has now adequately identified two of the Nurse Defendants, *i.e.*, Tanesia Davis and April Lawrence.   The Court will accordingly direct the Clerk to issue summons for service of Ford's pleadings on those two defendants.   Ford's claims against Nurse Mary, however, will be dismissed without prejudice in light of Ford's failure to comply with the terms of the Court's October 31st order as to the identification of that third Nurse Defendant.

Ford's related supervisory liability claim[8] against Dr. Lionel Anicette will be dismissed.

---

[8] The relevant legal standard governing supervisory liability is further detailed in other portions

Based on the limited factual allegations in support of that claim, it appears that Ford, in essence, claims that Anicette is liable because he failed to adequately address Ford's grievances and complaints about the Nurse Defendants. (DE 10 at ¶¶ 8, 9, 12.) In that respect, Ford's pleading expressly complains about the actions committed by Lawrence and Davis on June 3, 2017 only, *i.e.*, that is the only date explicitly referenced by Ford with respect to the nurses' actions. (*Id.* at ¶ 5.) Ford avers that he thereafter spoke to Anicette about the Nurse Defendants' inappropriate behavior on several occasions between June 9, 2017 and November 3, 2017, *i.e.*, *after* June 3, 2017. (*Id.* at ¶ 9.) A supervisory defendant's "participation in 'after-the-fact' grievance review[, however] is [insufficient] to establish personal involvement [for purposes of demonstrating § 1983 liability]." *Joy v. Healthcare C.M.S.*, 534 F. Supp. 2d 482, 485 (D. De. 2008); *see also Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (allegations that prison officials inappropriately responded to inmate's later-filed grievances insufficient to establish involvement in underlying constitutional deprivation). Ford's claim that Dr. Anicette failed to speak with the nurses after ensuring Ford that he would (*see* DE 10 at ¶ 9), even if true, likewise fails to give rise to a viable supervisory liability claim. *See Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008) ("The District Court properly dismissed [the defendants] who were sued based on their failure to take corrective action when grievances or investigations were referred to them.").

Ultimately, Ford's amended pleading fails to present any well-pled factual allegations which indicate that Anicette directed, had prior actual knowledge of, or otherwise acquiesced in, the constitutional violations allegedly committed by the Nurse Defendants. Ford's pleading likewise fails to plausibly suggest that Anicette's "actions and inactions [in his role as the Nurse Defendants' supervisor was] 'the moving force' behind the harm suffered by [Ford]." *Joy*, 534

of this opinion.

F. Supp. 2d at 485 (citing *Sample v. Diecks*, 885 F.2d 1099, 1117-18 (3d Cir. 1989)). Ford's supervisory liability claim against Anicette will accordingly be dismissed without prejudice.

### b. Ford's arrest-related claims against the NPD defendants

Ford's amended complaint, unlike his original complaint, formally asserts claims against NPD Officer Joseph Massenberg, Jr. and NPD Captain Meholaris for the alleged constitutional harms inflicted upon Ford in the course of his November 11, 2016 arrest. As an initial matter, the Court emphasizes that lone specific allegation against Captain Meholaris in Ford's amended complaint is a bald assertion that Meholaris is liable, in his role as an NPD supervisor, for the purportedly unconstitutional actions, detailed below, committed by Officer Massenberg. (DE 10 at ¶ 2.) Ford therefore fails to allege any facts which indicate that Meholaris personally interacted with Ford on November 11th or was otherwise directly involved in the NPD's arrest of Ford on that date. Again, "a pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (citations omitted). Any and all such § 1983 and NJCRA claims which Ford purports to assert against Meholaris will accordingly be dismissed because his amended pleading fails to plausibly suggest that Meholaris is responsible for the alleged wrongful conduct. *Id.*; *Kornegey*, 299 F. Supp. 3d at 680.

Ford, on the other hand, sufficiently alleges that Officer Massenberg utilized excessive force to effectuate Ford's arrest and thereafter used coercive methods to obtain an incriminating statement from Ford as he sat handcuffed in the back of a police car. (DE 10 at ¶¶ 1-3.) These allegations implicate Ford's rights under the Fourth Amendment. *Damiani v. Duffy*, 754 F. App'x 142, 146-47 (3d Cir. 2018) ("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard.") (quoting *Graham*, 490 U.S. at 395); *Torres v. McLaughlin*, 163 F.3d

169, 174 (3d Cir. 1998) ("[W]e refer to the Fourth Amendment as applying to those actions which occur between arrest and pre-trial detention."); *accord Villarosa v. North Coventry Township*, 711 F. App'x 92, 97 (3d Cir. 2017) ([O]ur precedents strongly indicate [that § 1983 plaintiff's claim that police coerced a third-party into giving an incriminating statement about her] would need to be brought under the Fourth Amendment.") (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 291-92 (3d Cir. 2014)).

### (i) Ford's excessive force claim against Massenberg may proceed

"A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates" the Fourth Amendment's protection against *unreasonable* searches and seizures. *Groman v. Township of Manatapan*, 47 F.3d 628, 633-34 (3d Cir. 1995) (emphasis added). In that regard, "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." *Id.* at 634 (citing *Edwards v. City of Philadelphia*, 860 F.2d 568, 572 (3d Cir. 1988)). Ultimately, "[a] claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable." *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002); *see also Graham*, 490 U.S. at 396. A police officer who "employ[s] excessive force in the course of handcuffing [violates] the Fourth Amendment." *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004); *see also Graham-Smith v. Wilkes-Barre Police Dep't*, 739 F. App'x 727, 732 (3d Cir. 2018) ("[T]he unreasonableness of handcuffing requires some indication that it was done unnecessarily or excessively.").

Here, Ford expressly alleges that Massenberg, in the course of arresting Ford on November 11, 2016, intentionally placed "too tight" handcuffs on him which caused a "stoppage of blood circulation[,] excruciating pain and suffering[,]" and long-term physical injuries to Ford's left

wrist, hand, and finger. (DE 10 at ¶¶ 1, 3.) None of the facts in Ford's pleading suggest that the manner in which Massenberg handcuffed Ford was reasonable under the circumstances. (*See generally*, *id.*) In light of these unequivocal factual allegations, and notwithstanding that the Third Circuit has cautioned against "open[ing] the floodgates to a torrent of handcuff claims," *Kopec*, 361 F.3d at 777, the Court will permit Ford's § 1983 and NJCRA excessive force claims against Massenberg to proceed past screening.

### (ii) Ford's coerced confession claim is dismissed

Ford's amended complaint makes a single passing reference to the fact that Massenberg used the "too tight" handcuffs to obtain a confession from him in the backseat of an NPD police vehicle. (DE 10 at ¶ 3.) A plaintiff may have a cause of action under § 1983 if he shows his "will was overborne [by the coercive actions of police officers] when he confessed." *Halsey*, 750 F.3d at 304 (quoting *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986)). Ford's singular allegation that he confessed to an unspecified crime while handcuffed, however, is insufficient to proceed this claim.

In order for Ford's coerced confession claim to survive the Court's *sua sponte* screening, he must present facts which allow the Court to determine, under "the totality of the circumstances[, that his] confession was coerced or involuntary." *United States v. Conley*, 859 F. Supp. 853, 862 (W.D. Pa. 1994) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Indeed, "[i]n determining whether [an individual's] will was overborne in a particular case, a court must assess the totality of all the surrounding circumstances, [including] both the characteristics of the accused and the details of the interrogation." *Conley*, 859 F. Supp. at 862 (citing *Schneckloth*, 412 U.S. at 266). Factors that may be considered include, but are not limited to: "the specific tactics utilized by the police in eliciting the admissions," *Miller*, 796 F.2d at 603, *cert. denied*, 479 U.S.

989 (1986); "the suspect's familiarity with the criminal justice system[,]" *Halsey*, 750 F.3d at 304

(citing *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005)); "the [age] of the accused; his

lack of education or his low intelligence; the lack of any advice to the accused of his constitutional

rights; the length of detention; the repeated and prolonged nature of questioning; and the use of

physical punishment such as the deprivation of food or sleep." *Schneckloth*, 412 U.S. at 226;

*accord Halsey*, 750 F.3d at 303-04.

Ford's amended pleading lacks sufficient specificity about the circumstances surrounding

his confession which would allow the Court to plausibly infer that Ford made a self-incriminating

statement because his will was overborn. As noted, Ford's present complaint contains a single,

vague allusion to Ford confessing to an unspecified crime while handcuffed in the backseat of an

NPD vehicle. His pleading lacks any additional factual details about, *inter alia*, the specific

crime(s) Ford confessed to, how long he sat in the car before he made that statement, or the

particular tactics which NPD members utilized to obtain that confession. Indeed, other than

Ford's implicit assertion that he was in pain when he confessed because he was in "too tight"

handcuffs, he does not present any facts that suggest that any NPD official subjected to him to any

physical or psychological distress. In light of these considerations, Ford's coerced confession

claim will be dismissed without prejudice.

### c. Ford's § 1983 inadequate medical care claims

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the United States Supreme Court made clear that:

(1) "the government [is obligated] to provide medical care for those whom it is punishing by

incarceration[;]" (2) "deliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment[;]" and (3)

"deliberate indifference to a prisoner's serious illness or injury states a cause of action under §

1983." *Id.* at 103-05. Non-convicted pretrial detainees, like Ford, are afforded substantially the same protections under the Due Process Clause of the Fourteenth Amendment. *See Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) ("[P]retrial detainees' [are protected] from 'punishment' under the Fourteenth Amendment, and convicted inmates' [are protected] from punishment that is 'cruel and unusual' under the Eighth Amendment.").

Ford's § 1983 denial of medical care claim is accordingly analyzed under *Estelle's* deliberate indifference standard. *See Covington v. Bucks County Dep't of Corr.*, No. 17-11397, 2019 WL 1418127, at *3 n.3 (D.N.J. Mar. 29, 2019) ("Without deciding whether the Fourteenth Amendment provides greater protections, the Third Circuit has found it sufficient to apply the Eighth Amendment standard set forth in [*Estelle*] when evaluating a claim for inadequate medical care by a detainee.") (citing *Banda v. Adams*, 674 F. App'x 181, 184 (3d Cir. 2017); *accord Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003); *see also Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987) ("[D]ecisions interpreting the Eighth Amendment serve as 'useful analogies' [for similar claims that instead arise under the Fourteenth Amendment].") (citation omitted); *but cf. Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) ("[A]t a minimum, the 'deliberate indifference' standard of *Estelle v. Gamble*, must be met" at an institution housing pretrial detainees).

Under *Estelle* and its progeny, Ford's § 1983 inadequate medical claim will proceed past screening if he pleads sufficient facts which show that he had a serious medical need to which defendants were deliberately indifferent. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017); *Mattern v. City of Sea Isle*, 657 F. App'x 134, 138 (3d Cir. 2016). Serious medical needs include "one[s] . . . diagnosed by a physician as requiring treatment or one[s] that [are] so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Mattern*,

657 F. App'x at 139 (quoting *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).   A prison official acts with deliberate indifference to those needs if he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."   *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (citation omitted).

In evaluating the adequacy of Ford's deliberate indifference claims under *Estelle*, the Court notes that "prisoners do not have a constitutional right to limitless medical care."   *Brown v. Beard*, 445 F. App'x 453, 456 (3d Cir. 2011).   Instead, "the state is obligated to provide [prisoners with] basic health care."   *Reynolds v. Wagner*, 128 F.3d 166, 173 (3d Cir. 1997).   Moreover, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."   *Palakovic v. Wetzel*, 854 F.3d 209, 227-28 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).   Indeed, "'[w]here a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'"   *Id.* at 227 (3d Cir. 2017) (quoting *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).   Courts accordingly afford deference to prison medical authorities in the diagnosis and treatment of patients, and "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment."   *Id.* (quoting *Inmates of Allegheny County*, 612 F.2d at 762 (3d Cir. 1979)).   In that respect, neither an inmate's personal, subjective dissatisfaction with the care he has been provided nor his disagreement with the professional judgment of trained medical staff is sufficient to establish deliberate indifference.   *See Hairston v. Director Bureau of Prisons*, 563

F. App'x. 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990); *Andrews v. Camden County*, 95 F. Supp. 2d 217, 228 (D.N.J. 2000).

Yet, "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Palakovic*, 854 F.3d at 228. "[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Id.* (citations and internal quotations omitted). They cannot "deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Id.* (citing *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). And "knowledge of the need for medical care may not be accompanied by the intentional refusal to provide that care." *Id.* (citations and alterations in original omitted).

### (i) Application of the foregoing principles to Ford's case

As an initial matter, Ford's amended complaint fails to plausibly suggest that either his claimed ulcer (*see* DE 10 at ¶ 14) or his purported decline in kidney functions (*see id.* at ¶ 15) constitutes a serious medical need under *Estelle*. Ford fails to allege that either condition has been formally diagnosed by a physician as requiring treatment. Instead, Ford's claim that he suffers from these ailments appears to be based entirerly on his own self-diagnosis. His assertion that these ailments are the result of Ford taking certain medications prescribed by Dr. Rizvi is likewise untethered to any formal medical determination. In the absence of a formal diagnosis, neither of these conditions is so obvious in nature that it would be easily recognized by a layperson as requiring medical treatment. The facts alleged in Ford's amended complaint therefore fail to show that either of these ailments is sufficiently "serious" for purposes of stating a *prima facie* deliberate indifference claim under *Estelle*.

Ford's purported injuries to his left wrist, on the other hand, represent an adequately pled "serious" medical need under *Estelle* because Ford has expressly alleged that physician/non-defendant Dr. Grace Melendez diagnosed Ford as suffering from carpal tunnel syndrome in his left wrist.[9]  (DE 10 at ¶ 20; *accord*, *e.g.*, DE 14-2 at PageID: 212 (medical document submitted by Ford includes formal carpal tunnel diagnosis).)  That said, Ford's pleading fails to allege facts which plausibly suggest that any defendant acted with deliberate indifference to that serious medical need.  To be clear, Drs. Paul O'Conner and Syed Rizvi are the only two defendants whom Ford specifically alleges were even aware of his left wrist injuries.  In that respect, Ford expressly claims that O'Conner rendered ineffective medical care for wrist-related injuries because the only treatment he offered between November 11, 2016 and December 21, 2016 was the provision of an ACE bandage on two occasions.  (DE 10 at ¶ 20.)  Ford also asserts that Rizvi and O'Conner knowingly prescribed him a medication, Tylenol, which they knew was ineffective to treat the pain in his left wrist.  (*Id.* at ¶ 21.)

These allegations are insufficient for purposes of proceeding this portion Ford's deliberate indifference claim.  Again, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable

---

[9] The Court wishes to make clear, however, that insomuch as Ford intends to assert that his carpal tunnel syndrome – or any other purported long-term injuries to his left wrist – are the result of Massenberg's placement of "too tight" handcuffs on him on November 11, 2016, his amended pleading fails to plausibly support such a proposition.  First, Ford does not claim – nor do the medical records Ford has submitted for review indicate – that Dr. Melendez, or any other physician, has ever concluded that Ford's purported "long term injur[ies] to [his] left hand and wrist[.]" are due to his November 11th handcuffing.  (DE 10 at ¶ 4.)  Second, while Ford expressly avers he was handcuffed in a manner which "caus[ed] stoppage of blood circulation and excruciating pain" (*see id.* at ¶ 3), his pleading fails to present any additional factual details, *e.g.*, the length of time those handcuffs remained on him, any assertion that a medical professional rendered immediate, emergent medical treatment for Ford's handcuffing-related injuries, *etc.*, that plausibly suggest that Ford's November 11th handcuffing – and that incident alone – resulted in the type of extreme injuries a layman could easily recognize as requiring a doctor's attention.

latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227-28. Moreover, other than his statement that he needed stronger pain medication, Ford does not indicate what additional treatment, if any, he should have received for his wrist. Ford likewise does not allege that any medical professional disagreed with O'Conner and Rizvi's course of treatment. Ultimately then, Ford's amended complaint fails to plausibly suggest that O'Conner and Rizvi's course of prescribed medical treatment for Ford's left wrist was objectively unreasonable or otherwise exposed Ford 'to undue suffering or the threat of tangible residual injury.'" *Palakovic*, 854 F.3d at 228; *see also Wilson v. Jin*, 698 F. App'x 667, 671 (3d Cir. 2017) ("Deliberate indifference . . . requires obduracy and wantonness which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk.") (internal citations and quotations omitted). Ford has therefore failed to plead facts which plausibly suggest that he received constitutionally inadequate medical care for his left wrist. This portion of Ford's § 1983 deliberate indifference claim is therefore dismissed at screening.

The Court now turns its attention to Ford's claim that numerous ECCF/CFG-affiliated defendants were deliberately indifferent to his serious medical needs because Ford has not received doctor-recommended neurosurgery to address Ford's spinal stenosis and related ailments affecting his left hip, spine, and left leg. Were this Court to rule on the adequacy of this claim based solely on the factual allegations contained in Ford's present complaint, it would find that Ford has failed to sufficiently allege that any of these medical conditions are sufficiently "serious" under *Estelle*. Indeed, none of these ailments are ever even expressly referenced in Ford's amended complaint. That pleading, specifically, instead contains only the following limited information about those underlying medical conditions and the resulting treatment Ford has received for the same as an ECCF detainee: On April 28, 2017, for unspecified reasons, a CT scan was performed on Ford

which showed that Ford needed an "emergency MRI and medical treatment." (DE 10 at ¶ 11.) On June 6, 2017, Ford had an MRI performed on him at EOGH. (*Id.* at ¶ 11.) Ford indicates that the results of his April 28th MRI and June 6th CT scan show that he needs otherwise unspecified neurological surgery, and that any delay in this procedure "[at Ford's] age and condition could and will cause paralysis."[10] (*Id.* at ¶ 29.) Ford avers that this surgical diagnosis is also consistent with "the referral and notes of the diagnosis of physician Ashley Simpson[.]" (*Id.* at ¶ 28.) On June 9, 2017, Ford was again, for reasons wholly absent from his amended complaint, returned to EOGH's emergency room. (*Id.* at ¶ 11.)

Ford also expressly claims that CFG administrative director Dr. Lionel Anicette and CFG employee Meio Perkins knew about Ford's urgent need for neurological surgery and intentionally interfered in the scheduling of certain off-site "medical referral trips" that Ford must attend before that surgical procedure can be performed. (*Id.* at ¶¶ 11, 28.) Ford, without further explanation, claims that Anicette is responsible for the "unnecessary delay" in his surgery. (*Id.* at ¶ 11.) He likewise claims that Perkins "for some reason[,] failed to provide [the] special transportation arrangements needed to transport" Ford to certain pre-surgery medical appointments. (*Id.* at ¶ 28.) Ford appears to claim that Drs. Rizvi, O'Conner, and Nafi are also responsible for delaying his surgery as he alleges that those defendants were, along with Anicette and Perkins, involved "in the conspiracy [to] delay [] treatment for serious medical needs for non-medical reasons." (*Id.* at ¶ 25.)

The foregoing facts represent the entirety of the specific factual allegations pled in Ford's amended complaint regarding his need for neurological surgery. The pleading, among other

---

[10] The Court notes that this claim is inconsistent with (1) the claims raised in Ford's original complaint; and (2) the additional medical documents Ford has submitted to the Court.

things, fails to explain why he was sent to EOGH on April 28, 2017 and likewise fails to explain why a CT scan was performed on him on that date. Furthermore, as pled, his claim that he needed an emergency MRI appears to have been addressed when that diagnostic exam was performed on him on June 6, 2017. *See Wisniewski v. Frommer*, 751 F. App'x 192, 195 (3d. Cir. 2018) (affirming Rule 12(b)(6) dismissal of § 1983 medical care claim where "[plaintiff's] allegations confirmed that he had been seen many times by medical providers who exercised professional judgment with respect to his care[.]") (quotations and alterations omitted). Moreover, while Ford's amended complaint expressly claims that a physician has recommended that he undergo emergency neurological surgery, and likewise details the grievous consequences that he will face if said surgery is not performed, *i.e.*, paralysis, his pleading lacks any additional details about the specific medical condition that this neurological surgery will address. Indeed, Ford's amended pleading, standing alone, fails to give sufficient context about the ailments underlying his need for surgery that would enable the Court to conclude that any of those unspecified medical issues are sufficiently "serious" under *Estelle*, much less that any defendant has rendered constitutionally inadequate care for the same.

That said, the Court having had the benefit of previously screening Ford's original complaint, understands the following additional information about this portion of Ford's deliberate indifference claim. Ford was sent to EOGH by Dr. O'Conner on April 28, 2017 because he could not walk. (DE 6 at 4.) After reviewing Ford's April 28th CT scan, a doctor at EOGH – presumably Dr. Simpson – "request[ed] his immediate transfer to [a different off-site medical facility] for surgery to correct a condition affecting Ford's sciatic nerve, followed by 90 days of rehabilitation to treat arthritis in Ford's left hip and leg." (*Id.*) At least three physicians reviewed Ford's June 6, 2017 MRI. (*Id.* at 5.) "Dr. [Rizvi] told Ford his MRI did not show anything

wrong, but *Dr. O'Conner told him he had a spinal hemorrhage.*" (*Id.*) A third unidentified physician at EOGH – again, presumably Dr. Simpson – "told Ford that either a needle in [his] spine can be used to prolong the surgery or [he] can get the surgery and pumped with heavy pain relieving narcotics." (*Id.*) On June 9, 2017, Ford returned to EOGH where he was given "heavy narcotic meds for pain management[.]" (*Id.* (internal quotations and citations to record omitted)) Based on consideration of these additional facts, the Court previously found that Ford failed to sufficiently allege a serious medical need for the purposes of proceeding his deliberate indifference claim against Drs. Rizvi and O'Conner. As the Court then explained:

> Ford's central claim against Drs. [Rizvi] and O'Conner is that they would not act on the referrals made by the doctors at [EOGH] after the hospital physicians conducted a [CT] scan on Ford's back and/or hip. Ford does not allege that Dr. [Rizvi] or Dr. O'Conner refused to treat his condition, but instead he disagrees with their decision not to act on the referrals made at [EOGH]. A prisoner can state a constitutional claim by alleging that a prison doctor intended to inflict pain without medical justification by plausibly claiming a large number of "specific instances in which the doctor allegedly insisted on continuing courses of treatment that the doctor knew were painful, ineffective or entailed substantial risk of serious harm to prisoners." *White*, 897 F.2d at 109. However, in the case of medical judgment, "[i]f the doctor's judgment is ultimately shown to be mistaken, at most what would be proved is medical malpractice, not [constitutional] violation." *Id.* at 110. Moreover, as noted, one physician is not required to accept the recommendation of another doctor.

(DE 6 at 12-13.)

Ford has not remedied the pleading deficiencies identified in the Court's October 31, 2017 screening opinion. Indeed, the Court's review of the information contained in the formal medical records included in Ford's post-November 2017 filings confirms that Ford's asserted need for immediate neurological surgery continues to be an issue of sound medical judgment. As an initial matter, the Court recognizes that Dr. Nafi, on August 16, 2017, concluded, based on his review of

the results of Ford's diagnostic tests, that Ford needed neurosurgery followed by "intense physical therapy which [could not] be arranged [while Ford remained confined in ECCF.]" (DE 14-2 at PageID: 199.)   Nafi contemporaneously advocated for Ford's compassionate release from ECCF in light of those considerations.   (DE 14-2 at PageID: 199.)   That said, the "grave" prognosis detailed in Nafi's August 16th medical notes is belied by the other medical records that Ford has selectively provided to the Court.   For example, non-defendant Dr. Anthony Kaiser's notes from July 28, 2017 indicate that Ford "look[ed] much improved [and] ambulate[d] upright[.]"   (DE 13-1 at PageID: 184.)   Kaiser therefore recommended only that Ford "continue ambulation with walker[.]"   (*Id.*)   On September 5, 2017, Nafi also observed that Ford, at that time, was able to walk without "acute distress" through the use of a walker and that there were otherwise no "new complaints [nor new medical findings]."   (DE 14-2 at PageID: 213-14.)   Rizvi likewise noted that as of on October 10, 2017, Ford's ailments represented a "stable medical problem."   (DE 14-2 at PageID: 205.)   Rizvi's December 15, 2017 progress notes similarly show that Ford was then still walking, with the assistance of a walker, without acute distress.   (DE 20 at PageID: 272.)

The Court readily acknowledges that Ford's stenosis and other associated ailments are indeed severe as alleged.   Ultimately, however, the Court concludes, based on its review of the specific factual allegations in Ford's amended pleading, as well as its consideration of the claims raised in Ford's original complaint and the information contained in Ford's medical records, that he has not sufficiently demonstrated that any defendant has acted with constitutionally actionable deliberate indifference to Ford's purported need for neurological surgery.   The Court, in so finding, stresses that the documents of record unquestionably show that Ford has received extensive medical attention since arriving at ECCF in November 2016, including for his stenosis and related hip, back, and sciatic nerve conditions; this fact remains true notwithstanding that much

of his care was provided off-site by individuals unaffiliated with ECCF and/or CFG.  Indeed, Ford's amended pleading expressly references three different dates on which he was taken to EOGH for evaluation and treatment.  *Battle v. McGann*, No. 17-12041, 2018 WL 5263279, at *4 (D.N.J. Oct. 23, 2018) ("In light of Plaintiff's multiple treatments and evaluations, it is apparent that the complaint shows only a [non-actionable] difference in opinion over the course of proper medical treatment rather than a complete denial of medical care.").  Furthermore, the fact that Ford has not received the neurological surgery he asserts he needs, standing alone, fails to demonstrate that any defendant was deliberately indifferent to his serious medical needs.  Again, "prisoners do not have a constitutional right to limitless medical care."  *Brown*, 445 F. App'x at 456); *accord Watford v. New Jersey State Prison*, No. 16-7878, 2017 WL 131562, at *4 (D.N.J. Jan. 12, 2017) ("Plaintiff's subjective dissatisfaction with the slow course of his treatment is insufficient to support a claim for relief for a violation of his constitutional rights.").

For the foregoing reasons, Ford's amended complaint fails to suggest that he received inadequate medical care for any of his injuries from any of the defendants identified above, *i.e.*, Rizvi, O'Conner, Nafi, Anicette, and Perkins.  His pleading similarly fails to allege facts which plausibly suggest that any of these defendants were deliberately indifferent to his serious medical needs in a manner which violated Ford's rights under the United States Constitution.  The Court will accordingly dismiss Ford's § 1983 deliberate indifference to medical needs claim as to all of these defendants.

### d.  DiVincenzo remains dismissed as a defendant in this matter for substantially the same reasons identified by the Court in its October 31, 2017 screening opinion

Ford claims that Essex County Executive Joseph DiVincenzo, Jr. is liable, in his supervisory capacity, for the purportedly constitutionally deficient medical care Ford received at

ECCF. (DE 10 at ¶ 35.) The lone specific factual allegation in Ford's amended complaint against DiVincenzo is that he had a duty "to 'inspect' to make sure that [CFG is providing] appropriate and effective health care for the inmates of [ECCF]." (*Id.* at ¶ 35.) The Court's October 31st screening opinion found that a similar factual allegation made by Ford in his original complaint, standing alone, failed to support a viable § 1983 claim against DiVincenzo. As the Court then explained:

> "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676. However, "a supervisor may be personally liable . . . if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Tp.*, 629 F.3d 121, 129 (3d Cir. 2010) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)). A supervisor may also be liable for an Eighth Amendment [or Fourteenth Amendment] violation if the plaintiff "identif[ies] a supervisory policy or procedure that the supervisor defendant failed to implement, and prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure." *Barkes v. First Corr. Medical Inc.*, 766 F.3d 307, 330 (3d Cir. 2014)[, *rev'd on other grounds sub nom.*] *Taylor v. Barkes*, 132 S.Ct. 2042 (2015).
>
> . . . . [Ford's] claim against [DiVincenzo] for failing to "create an effective monitoring system to ensure that inmates . . . are being provided with standard of care that would prevent pain and suffering" [is] insufficient [under this standard].
>
> To state a supervisory liability claim Ford must allege how [DiVincenzo was] aware that "the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation" or that "the constitutional injury was caused by the failure to implement the supervisory procedure." It is not enough for Ford to allege he was dissatisfied with the treatment provided by the contracted medical providers in the jail and that the non-medical prison officials did not respond to his

complaints. *See Durmer*[, 991 F.2d at 69] (non-medical prison officials are not deliberately indifferent simply because "they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.").

(DE 6 at 14-15.)

The foregoing pleading considerations apply with equal force today. Ford, however, has not amended his allegations against DiVincenzo in any meaningful way. His current complaint instead recites a singular factual allegation against DiVincenzo, *i.e.*, that he had a duty, as county executive, to ensure that CFG was providing appropriate and effective health care to ECCF inmates. The Court has already expressly found that this allegation fails to support a viable § 1983 claim. (*See id.*) Thus, the same considerations which supported non-prejudicial dismissal of DiVincenzo as a defendant when the Court screened Ford's original complaint continue to support DiVincenzo's dismissal, without prejudice, as a defendant in this matter.

> **e. Paschall likewise remains dismissed as a defendant for the reasons identified by the Court in its October 31, 2017 screening opinion**

Ford has likewise failed to address any of the pleading deficiencies previously identified by the Court with respect to his claims against CFG Chief Operating Officer Les Paschall. Ford again avers only that Paschall is responsible, under a theory a supervisory liability, for the deficient medical care Ford received at ECCF as a pre-trial detainee. (DE 10 at ¶ 26.) Ford's amended pleading, like his original complaint, fails to detail any incident or other specific facts which suggest that Paschall had any personal, direct interactions, whatsoever, with Ford or with any of the other CFG and/or ECCF-affiliated defendants. As the Court has previously explained, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (DE 6 at 15 (quoting *Iqbal*, 556 U.S. at 676).) The Court accordingly again "dismisses CFG Chief Executive Officer Les Paschall as a defendant because

[Ford fails to] allege his personal involvement in a constitutional violation. Dismissal of Paschall is without prejudice." (DE 6 at 15.)

### f. Ford's § 1983 conditions of confinement claim against Warden Green has already been dismissed with prejudice; Ford's § 1983 deliberate indifference to medical needs claims against Green remains subject to non-prejudicial dismissal

In his amended complaint, Ford claims that Warden Green is liable for the sciatic nerve pain which Ford has experienced "from jumping up and down [from the] top bunk" in which Ford slept. (DE 10 at ¶ 33.) Ford further avers that Green is aware of this "dangerous hazardous condition" and has not taken any action to abate ECCF's problematic "inmate population bedding arrangement." (*Id.* at ¶¶ 33, 34.) Insomuch as Ford's is again attempting to assert a § 1983 conditions of confinement claim against Green based on his bedding arrangement at ECCF, that claim remains subject to prejudicial dismissal for the reasons explained by the Court in its October 31, 2017 screening opinion. (*See* DE 6 at 8-9 (concluding that "[Ford's] conditions of confinement claims based on access to the top bunk are dismissed with prejudice because amendment is futile.").)

Ford's amended complaint also specifically alleges that Green has failed to properly ensure that Ford received "effective medical services conducive to [his] serious medical needs[.]" (DE 10 at ¶ 32.) In support of that claim, Ford specifically alleges only that he complained to Green, directly, about the improper conduct of ECCF-affiliated medical personnel (*id.*), and that Green himself witnessed the ineffective care being provided to ECCF inmates during personal inspections of its medical facilities between August and October 2017. (*Id.* at ¶ 31.)

For substantially the same reasons identified by the Court in its October 31st screening opinion, Ford's present factual allegations fail to support a viable § 1983 claim against Green. Again, "[Green's] alleged failure to rectify inadequate medical care after receiving Ford's

grievances fails to state a claim." (DE 6 at 14 (citing *Brooks*, 167 F. App'x at 925).) Moreover, the limited facts detailed in Ford's current pleading regarding Green's actions, detailed above, fail to cure any of the other pleading deficiencies noted in the Court's October 31st decision. (*See* DE 6 at 14-15.) Ford's amended complaint therefore fails to plausibly suggest that Green is responsible for the purportedly deficient medical treatment he has received at ECCF, either in his role as ECCF supervisor or based on his personal interactions with Ford. As such, Ford's § 1983 deliberate indifference claim against Green remains subject to non-prejudicial dismissal.

### g. Ford's retaliation claim against Rizvi and O'Conner may now proceed

Ford claims that Rizvi and O'Conner subjected him to threats and retaliatory measures because he filed grievances about ECCF medical staff. (DE 10 at ¶ 23.) Ford's grievances are protected by the First Amendment. Ford therefore may have a viable claim under § 1983 if he was subjected to retaliatory measures for complaining about his medical treatment while detained. *Smith v. Merline*, 797 F. Supp. 2d 488, 504 (D.N.J. 2011). This claim will survive the Court's screening if Ford's amended complaint presents sufficient facts demonstrating the following:

> (1) that the conduct leading to the alleged retaliation was constitutionally protected; (2) that he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) that his protected conduct was a substantial or motivating factor in the decision to discipline him.

*Alexander v. Fritch*, 396 F. App'x 867, 871 (3d Cir. 2010) (internal citations omitted).

The Court, in its October 31st screening opinion, dismissed Ford's retaliation claim against Rivzi and O'Conner without prejudice. As the Court then explained, "Ford's allegations that Dr. [Rizvi] and Dr. O'Conner have threatened him with 'retaliatory behavior' are insufficient to describe an adverse action that would deter a person of ordinary firmness from exercising his constitutional rights. [Ford] must [instead] describe the specific threats that were made." (DE 6

at 16.)

Ford, by way of his amended complaint, again alleges that Rizvi and O'Conner threatened him with retaliatory actions because he filed grievances about his medical treatment while at ECCF. (DE 10 at ¶¶ 17, 23.) Ford also now specifically claims that those defendants in fact retaliated against him by prescribing him medication "that would barely [alleviate his] pain and spasms" and by "deny[ing Ford] hot water bottles, ice packs *etc.*" (*Id.* at ¶ 23.) "[T]he denial of medical care can constitute adverse action for First Amendment purposes." *Whitenight v. Harry*, No. 4:16-CV-1350, 2019 WL 1782139, at *12 (M.D. Pa. Jan. 23, 2019), *report and recommendation adopted*, 2019 WL 1779507 (M.D. Pa. Apr. 23, 2019).

Affording Ford all favorable inferences, the Court finds, at this preliminary stage, that the limited additional facts pled by Ford sufficiently support a viable § 1983 retaliation claim against Rizvi and O'Conner. Indeed, Ford links the constitutionally protected conduct he engaged in, *i.e.*, complaining about his medical treatment at ECCF, to Rizvi and O'Conner's threats of retaliation and ultimate decision to prescribe him medication that would only "barely" alleviate his pain. The Court will therefore now allow Ford's retaliation claim against those two defendants to proceed. *But see McGinnis v. Hammer*, 751 F. App'x 287, 292 n.2 (3d Cir. 2018) ("[Plaintiff's] conclusory allegation that his grievance was a substantial motivating factor in [correctional facility's physician assistant's] decision to deny ibuprofen fails to reflect more than a sheer possibility that a defendant has acted unlawfully.") (citations and internal quotations omitted); *Whitenight*, 2019 WL 1782139 at *12 ("[T]he defendants cannot be said to have taken an adverse action against Whitenight by providing him with medical care simply because it was not the medical care that the plaintiff desired.").

### h. Ford's allegations that certain defendants taunted him do not give rise to § 1983 liability

Ford's amended pleading expressly alleges that Nurse Davis, Nurse Lawrence, and Dr. Rizvi verbally abused him. As the Court has previously explained to Ford, "[a]llegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under § 1983." (DE 6 at 12 (citing *Stokes v. Lanigan*, Civ. No. 12-1478, 2012 WL 4662487, at *7 (D.N.J. Oct. 2, 2012)).) Consequently, Ford's assertion that ECCF staff verbally harassed and abused him, without more, is not actionable under § 1983

### i. Ford's § 1983 conspiracy claim is dismissed without prejudice

"The [specific] elements of a claim of conspiracy to violate federal civil rights are that: (1) two or more persons conspire to deprive any person of constitutional rights; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States, with the added gloss under § 1983 that the conspirators act under the color of state law." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 294 n. 15 (3d Cir. 2018) (citing *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)) (internal quotations and bracketing omitted). Ford's bald assertion that Rizvi, O'Conner, Nafi, Anicette, Perkins, and other unnamed defendants were involved "in the conspiracy, play, scheme, or delay of treatment for serious medical needs for non-medical reasons" (*see* DE 10 at ¶ 25) fails to support a *prima facie* conspiracy claim under this standard. There are likewise no other facts in Ford's amended complaint which plausibly suggest that any of the other defendants identified in that pleading conspired to deprive Ford of any constitutional right. Ford's § 1983 conspiracy claim is accordingly dismissed, in its entirety, without prejudice.

**j. ECCF is not a "person" subject to § 1983 liability**

The caption of Ford's amended pleading lists Ford's present place of confinement, ECCF – incorrectly listed as Essex County Jail – as a standalone defendant. Insomuch as Ford intends to pursue any § 1983 claims against ECCF, he is precluded from doing so because correctional facilities are not "persons" subject to suit under that statute. *See Parrish v. Ocean Cnty. Jail*, No. 13-2020, 2013 WL 5554687, at *2 (D.N.J. Sept. 20, 2013) (holding that Ocean County Jail is not a person subject to suit under 42 U.S.C. § 1983) (citations omitted); *accord Ross v. Burlington Cty. Jail*, No. 12-338, 2013 WL 3514191, at *2 (D.N.J. July 11, 2013) (citations omitted); *Ruiz v. Stills*, No. 09-4259, 2012 WL 762166, at *4 (D.N.J. Mar. 7, 2012) (citations omitted). In other words, Ford cannot, as a matter of law, obtain relief from ECCF under 42 U.S.C. § 1983. Any and all such § 1983-based claims which Ford is attempting to assert against that correctional facility are accordingly dismissed with prejudice.

**VI. CONCLUSION**

For the reasons set forth herein, the following claims may now proceed: (1) Ford's § 1983 retaliation claim as against Dr. Paul O'Conner, Dr. Syed Rizvi, Nurse April Lawrence, and Nurse Tanesia Davis; (2) his § 1983 deliberate indifference to medical needs claim as against Lawrence and Davis; and (3) Ford's newly-asserted § 1983 and NJCRA excessive force claims as against Officer Joseph Massenberg, Jr. Ford's conditions of confinement claim against Essex County Executive Joseph DiVincenzo, Jr. remains dismissed. Pursuant to 28 U.S.C. §§ 1915(e)(2)(B), the Court also now dismisses Ford's § 1983 and NJCRA claims against ECCF i/p/a Essex County Jail with prejudice. This means that Ford cannot brings those claims again. All other claims in Ford's pleading are/remain dismissed without prejudice as against all other named defendants. Ford is provided forty-five (45) days to file a second amended complaint as to those claims

dismissed without prejudice.[11]   If he fails to do so, then those claims will also be dismissed with

prejudice.   An appropriate Order accompanies this Opinion.


Date: July 18, 2019                                    s/ John Michael Vazquez
At Newark, New Jersey                          JOHN MICHAEL VAZQUEZ
                                                             United States District Judge

---

[11]   Ford should note that when an amended complaint is filed, it supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.  *See West Run Student Housing Associates, LLC v. Huntington National Bank*, 712 F.3d 165, 171 (3d Cir. 2013) (collecting cases); *see also* 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476 (3d ed. 2008).  To avoid confusion, the safer practice is to submit an amended complaint that is complete in itself.  Wright & Miller, *supra*, at § 1476.